UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| Jazz Pharmaceuticals Research UK Limited,<br><br>    *Plaintiff*,<br><br>v.<br><br>Teva Pharmaceuticals, Inc., et al.,<br><br>    *Defendants*. | Civil Action No. 23-18(MEF)(AME)<br><br><u>OPINION and ORDER</u> |

Table of Contents

I. Background

    A. Facts

    B. Procedural History

    C. The Counterclaim

    D. The Motion

    E. The Court's Approach

II. Pleading Standards

    A. Counterclaims In General

    B. Pleading Inequitable Conduct: Elements

    C. Pleading Inequitable Conduct: Rule 9(b)

III. The Defendants' Small Entity Argument

    A. Small Entities: In General

    B. Small Entities: The Plaintiff's Patent Applications

    C. The Defendants' Argument

IV. The First Element of the Argument: Materiality

      A. The 2017 Applications

      B. The 2015 and 2016 Applications

  V.   The Second Element of the Argument: Intent

  VI.  Conclusion

*   *   *

A company obtained certain patents in connection with a drug it developed. Other companies then applied to sell a generic version of the drug.

The patentholder sued, principally claiming that sale of the generic drug would infringe its patents. Some of the companies then counterclaimed, alleging the patents are not enforceable.

The patentholder now moves to dismiss one set of the counterclaims.[1]

The motion is granted.

*   *   *

## I. Background

### A. Facts

During 2018 to 2022, a company obtained various patents in connection with the development of a drug ("Drug"). See Complaint for Patent Infringement ("Complaint") ¶¶ 19-43.

In 2022, certain other companies applied to the Food and Drug Administration for permission to manufacture and market a generic version of the Drug. See id. at ¶¶ 177, 183, 188, 193, 200, 205, 210, 215, 220, 227.

### B. Procedural History

---

[1] The motion also seeks to dismiss another set of counterclaims. Those are addressed in a separate order.

2

In 2023, the company that developed the Drug brought this lawsuit. The company alleges that: (a) the Food and Drug Administration applications infringed its patents, and (b) approval of the applications would cause more infringement. See id. at ¶¶ 1, 233, 235, 393, 396, 553, 556, 713-16.

The company is referred to as "the Plaintiff."[2]

The Plaintiff's lawsuit is against various defendants. These are companies that submitted the Food and Drug Administration applications, and companies that worked with the applicants.

Some of the defendants filed counterclaims against the Plaintiff. One set of counterclaims is relevant here. This set is referred to as "the Counterclaim."[3]

The defendants who filed the Counterclaim are referred to as "the Defendants."[4]

### C. The Counterclaim

The core of the Defendants' Counterclaim: the Plaintiff engaged in "inequitable conduct" by telling the United States Patent and Trademark Office ("PTO") it was a "small entity," when it was not. See Answer, Affirmative Defenses, and Counterclaims to Plaintiff's Complaint for Patent Infringement ("Affirmative Defenses") ¶¶ 47, 55, 76.

Because of this, the Defendants argue, certain patents cannot be enforced and the Defendants cannot be liable for infringing

---

[2] The Plaintiff was GW Research Limited. It changed its name while this lawsuit was pending. Its current name is Jazz Pharmaceuticals Research UK Limited. The caption was changed, on motion, to reflect this.

[3] The Counterclaim allegations are at Answer, Affirmative Defenses, and Counterclaims to Plaintiff's Complaint for Patent Infringement ¶¶ 47-76.

[4] The Defendants: Invagen Pharmaceuticals, Inc.; Cipla LTD.; Cipla USA, Inc.; and API Pharma Tech LLC.

them.  See generally Therasense, Inc. v. Becton, Dickinson & Co., 649 F.3d 1276, 1285 (Fed. Cir. 2011) (en banc) ("Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent.").[5]

### D. The Motion

The Plaintiff, as noted, moved to dismiss the Counterclaim.

Papers were filed and oral argument was held.  After the argument, the motion to dismiss was withdrawn, and a new motion to dismiss the Counterclaim was filed.

The new motion became fully submitted around three months ago.

That motion is now before the Court.

### E. The Court's Approach

After a brief discussion in Part II of the pleading standards here, the Court lays out in Part III the Defendants' argument in support of the Counterclaim.

The Court then analyzes, in Part IV and Part V, whether the Defendants properly pled the two elements of the Counterclaim. The Court concludes: they did not.

Therefore, in Part V, the Court dismisses the Counterclaim.

## II. Pleading Standards

### A. Counterclaims In General

As noted, the Plaintiff has moved to dismiss the Counterclaim.

A motion to dismiss a counterclaim (in an answer) is evaluated under the same standard as a motion to dismiss a claim (in a complaint).  See Polysciences, Inc. v. Masrud, 2023 WL 3377084, at *1 (3d Cir. May 11, 2023); Oppenheimer v. Trs. of Stevens Inst. of Tech., 2023 WL 4217697, at *1 (D.N.J. June 27, 2023).

---

[5] The patents in question are specified as relevant below.

4

To survive a motion to dismiss, a counterclaim must plead facts that make the claim for relief set out in the counterclaim "plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (cleaned up). A counterclaim is plausible "when the [counterclaimant] pleads factual content that allows the court to draw the reasonable inference that the [counterclaim] defendant is liable for the misconduct alleged." Id. at 678. This analysis is "context specific, requiring the reviewing court to draw on its experience and common sense." Id. at 663-64.

### B. Pleading Inequitable Conduct: Elements

On a motion to dismiss, the Court first "must tak[e] note of the elements the [counterclaimant] must plead[.]" Connolly v. Lane Constr. Corp., 809 F.3d 780, 787 (3d Cir. 2016).

Here, the Counterclaim is based on allegations of inequitable conduct. See Part I.C.

The elements of inequitable conduct are materiality and intent.

> [A] pleading of inequitable conduct . . . must include sufficient allegations of underlying facts from which a court may reasonably infer that a specific individual (1) knew of the withheld material information or of the falsity of the material misrepresentation, and (2) withheld or misrepresented this information with a specific intent to deceive the PTO."

Exergen Corp. v. Wal-Mart Stores, Inc., 575 F.3d 1312, 1328-29 (Fed. Cir. 2009).

### C. Pleading Inequitable Conduct: Rule 9(b)

In addition to the above, Federal Rule of Civil Procedure 9(b) sets out certain heightened pleading standards.

To plead inequitable conduct, Rule 9(b)'s standards must be met. See Exergen Corp., 575 F.3d at 1326.

As to materiality, Rule 9(b) requires "identification of the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO." Id. at 1327.

As to intent, Rule 9(b) "requires that the pleadings allege sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind." Id.

### III. The Defendants' Small Entity Argument

As noted, see Part I.C, the Counterclaim is based on the Plaintiff's allegedly false representations to the PTO that it was a small entity.

The Court in this section sets out the background to the Counterclaim, focusing on: small entities in general (Part III.A); the Plaintiff classifying itself as a small entity (Part III.B); and the Defendants' argument for why this amounted to inequitable conduct (Part III.C).

#### A. Small Entities: In General

When a "small entity" applies for a patent, it can pay lower fees. See 37 C.F.R. § 1.27; 13 C.F.R. § 121.802.

For example, a small entity today pays $128 for a Utility Basic Filing Fee. See USPTO Fee Schedule, United States Patent and Trademark Office, https://www.uspto.gov/learning-and-resources/fees-and-payment/uspto-fee-schedule#Patent%20Fees (last visited Jan. 10, 2024). Other entities are required to pay $320.

Another example: small entities pay $320 for a Utility Examination Fee, while others pay $800. See id.

#### B. Small Entities: The Plaintiff's Patent Applications

6

The Plaintiff applied for the relevant patents on four occasions: June 2015;[6] October 2015;[7] June 2016;[8] and March 2017.[9]

In these applications, the Plaintiff identified itself as a small entity. See Affirmative Defenses ¶¶ 53, 60-64, 67-68, 71-73.

### C. The Defendants' Argument

The Defendants argue the Plaintiff engaged in inequitable conduct, because it told the PTO it was a small entity, but it was not. See Affirmative Defenses ¶¶ 47, 76.

Therefore, the argument goes, certain patents cannot be enforced,[10] and neither can various related patents.[11] See id. at ¶¶ 76, 139, 149, 159, 169, 179, 189, 199, 209, 219, 229, 239, 249; see generally Therasense, 649 F.3d at 1285.

To assess this argument, recall that inequitable conduct has two elements, materiality and intent. See Part II.B.

---

[6] These became the following patents: 11,311,498 ("the '498 patent") and 9,474,726 ("the '726 patent"). See Affirmative Defense ¶¶ 53-54, 67.

[7] This became the following patent: 10,111,840 ("the '840 patent"). See Affirmative Defense ¶ 68.

[8] This became the following patent: 10,709,671 ("the '671 patent"). See Affirmative Defense ¶ 71.

[9] These became the following patents: 9,949,937 ("the '937 patent"), 9,956,183 ("the '183 patent"), 9,956,184 ("the '184 patent"), 9,956,185 ("the '185 patent"), 9,956,186 ("the '186 patent"), 10,092,525 ("the '525 patent"), and 10,137,095 ("the '095 patent"). See Affirmative Defenses ¶¶ 56, 60-64, 69, 72-73.

[10] The patents in footnotes 6-9.

[11] These are: 10,709,673 ("the '673 patent"), 10,709,674 ("the '674 patent"), 10,849,860 ("the '860 patent"), 10,966,939 ("the '939 patent"), 11,096,905 ("the '905 patent"), 11,154,516 ("the '516 patent"), 11,357,741 ("the '741 patent"), 11,446,258 ("the '258 patent"), and 10,603,288 ("the '288 patent"). See Affirmative Defenses ¶ 76.

The Court's analysis of these elements follows.

## IV. The First Element of the Argument: Materiality

The Defendants' argument for why the Plaintiff's small entity representations to the PTO were material is in three parts.

First, an applicant's representation to the PTO about its small entity status counts as a representation made in an affidavit. See Brief in Opposition at 12.

Second, the Plaintiff's small entity representations to the PTO in this case were "unmistakably" false. See id.

And third, offering up an "unmistakably" false representation in an affidavit always establishes materiality for inequitable conduct purposes. See id.

This argument is not persuasive.

Why? Because the second link in the chain does not hold up. As explained just below, the Defendants did not properly plead that the Plaintiff's representations that it was a small entity were "unmistakably" false.[12]

### A. The 2017 Applications

Start with the Defendants' argument as to the applications for the '937, '183, '184, '185, '186, '525, '095 patents. These were filed with the PTO on March 3, 2017 and are referred to as "the 2017 Applications."

The Defendants' argument: in the 2017 Applications, the Plaintiff said it was a small entity, but that was no longer true by the March 3, 2017 application date. See Affirmative Defenses ¶¶ 58, 60-64, 72-73.

An entity is "small" for these purposes if it has less than 500 employees. See 37 C.F.R. § 1.27 and 13 C.F.R. § 121.802(a); see

---

[12] Given this conclusion, the Court need not, and therefore does not, decide whether the first and third components of the Defendants' argument are based on correct statements of the law.

8

generally Outside the Box Innovations, LLC v. Travel Caddy, Inc., 695 F.3d 1285, 1292 (Fed. Cir. 2012).

To count employees:

> [T]he average number of employees . . . is used . . . based upon numbers of employees for each of the pay periods for the preceding completed 12 calendar months.

13 C.F.R. § 121.106(b)(1) (2017).[13]

Accordingly, the relevant period here is early March 2017 to March 2016. March 2017 is when the patent applications were filed. And running back from there over "the preceding . . . 12 calendar months" sets the starting point at March 2016.

---

[13] Two points. First, the quoted regulation ("Regulation") is the one that was on the books in 2017, when the 2017 Applications were filed. Second, the Defendants do not argue the Regulation is not controlling, and they do not point to some other source of law that might apply instead. All with good reason: the Regulation sets the governing standard here. A patent applicant may pay reduced fees if it is small "as defined under [S]ection 3 of the Small Business Act." 35 U.S.C. § 41(h)(1). In turn, Section 3 of the Small Business Act allows the Administrator of the Small Business Administration to "specify detailed definitions or standards by which a business concern may be determined to be a small business concern for the purposes of this chapter or any other Act." 15 U.S.C. § 632(a)(2)(A). Based on this authority, the Small Business Administration promulgated Title 13, Part 121. See Small Business Administration Size Standards, 61 Fed. Reg. 3280-01 (Jan. 31, 1996) (to be codified at 13 C.F.R. pt. 121). And Title 13, Part 121 includes the Regulation. Cf. DH Tech., Inc. v. Synergystex Int'l Inc., 937 F. Supp. 902, 905-06 (N.D. Cal. 1996) (calculating the average number of employees over the previous year to determine if the patent applicant had over 500 employees) vacated and remanded on other grounds by DH Tech., Inc. v. Synergystex Int'l Inc., 154 F.3d 1333, 1345 (Fed. Cir. 1998); Small Business Size Standards: Calculation of Number of Employees for All Programs and of Average Annual Receipts in the Business Loan, Disaster Loan, and Small Business Investment Company Programs, 87 Fed. Reg. 34094-01 at *34107 (June 6, 2022) (noting that a change in Small Business Administration standards as to what counts as "small" will impact, among other things, the sorts of entities eligible for reduced patent fees).

As to this March 2016 to March 2017 period, the Defendants do not provide direct evidence as to "the average number of employees."

Rather, they make two core allegations, and invite the Court to draw inferences from these.

The first allegation: the Plaintiff had 496 employees as of September 2016. See Answer & Amended Complaint ¶ 58.

The second: the Plaintiff had 586 employees "less than a year later." See id.

From this, the Defendants conclude the Plaintiffs were growing at a rate of "more than eight employees" per month. See Brief in Opposition 17.[14]

Now, do some quick calculations. If the Plaintiff had 496 employees in September 2016, and was growing by about 8 employees per month,[15] it had about 537 employees in the beginning of March 2017 and around 447 employees in March 2016.

This yields an average number of employees-per-month for the relevant period (March 2016 to early March 2017) of approximately 492.[16]

---

[14] The Defendants' logic appears to be this: growing by 90 employees (from 496 to 586) over the course of, say, 11 months ("less than a year later") yields a growth rate of a bit less than 8.2 employees per month ("more than eight employees"). Id.

[15] Actually about 8.2, as set out in footnote 14.

[16] The fuller calculation: 446.8 by the end of March 2016, 455 by the end of April, 463.2 by the end of May, 471.4 by the end of June, 479.6 by the end of July, 487.8 by the end of August, 496 by the end of September, 504.2 by the end of October, 512.4 by the end of November, 520.6 by the end of December, 528.8 by the end of January 2017, and 537 by the end of February. The total of these numbers is 5,902.8. 5,902.8 divided by 12 is 491.9. Because this is a rough calculation, the Court does not account for any additional employees between the end of February and March 3; March 3 is, as noted, when the 2017 Applications were filed.

10

This lower-than-500 number is all-but dispositive.[17]

A party that needs to allege a false statement cannot check that box by alleging a true statement. See, e.g., In re Sona Nanotech, Inc. Sec. Litig., 562 F. Supp. 3d 715, 725 (C.D. Cal. 2021); see also United Food & Comm. Workers Union & Emps. Midwest Health Benefits Fund v. Novartis Pharm. Corp., 902 F.3d 1, 13 (1st Cir. 2018).

But that is in essence what the Defendants seek to do here. Their claim is that the Plaintiff's statements to the PTO (we have less than 500 employees) were false. But the Defendants press this claim based on allegations and argument that suggest the statements were true, not false. After all, a company that has 492 employees, and then says that it has fewer than 500 employees, is making a true statement.

And the point is stronger yet. To plead inequitable conduct on the theory they have advanced, see Part III.C, the Defendants must plead the Plaintiff made an "unmistakably" false statement --- an obviously or plainly or clearly false statement. How can a statement be obviously false based on arguments and allegations that imply it was true?[18]

---

[17] Note: the Defendants also allege that in the Plaintiff's "public filings, it represented that it had gained over 100 employees within a year to achieve 496 employees as of September 30, 2016[.]" Affirmative Defenses ¶ 58. This allegation may imply a per-month growth rate closer to 8.3 than 8.2 for at least some of the relevant period. But this makes no meaningful bottom-line difference.

[18] Could the Defendants have pushed over the line of plausibility, see Part II.A, by alleging only that the Plaintiff had 586 employees in August 2017 --- and then inviting the Court to infer from there that the Plaintiff averaged more than 500 employees-per-month during the relevant March 2016 to March 2017 period? Maybe, maybe not. (A 586-employee allegation, by itself, at least would not affirmatively suggest that the Plaintiff's allegedly false statement was true.) The question, though, does not need to be answered here. The Defendants did not ask the Court to draw an inference based on only a single data point. They also alleged the Plaintiff had 496 employees in September 2016, and argued this implied a growth rate of around 8 employees a month. The sum of all this may be less

11

## B. The 2015 and 2016 Applications

Turn now to consider the Defendants' argument as to some other patent applications, filed in 2015 and 2016 ("the 2015 and 2016 Applications").[19]

As to the 2015 and 2016 Applications, the Defendants claim the Plaintiff made unmistakably false representations of its small entity status because these Applications concerned patents as to which the Plaintiff had a licensing agreement with a large entity. See Affirmative Defenses ¶¶ 54, 67-68, 71; see generally 13 C.F.R. § 121.802(b) (a company may be eligible for reduced patent fees if it has not "licensed (and is under no obligation to do so) any rights in the invention to . . . any concern which would not qualify as a . . . small business"); Outside the Box Innovations, LLC, 695 F.3d at 1292-95.

But this is not persuasive.

The agreement in question is from 2007 ("2007 Agreement"). See Affirmative Defenses ¶ 48. The 2007 Agreement was between the Plaintiff and another entity, see id.; that entity was allegedly not a small entity. See id. at ¶ 51. In the 2007 Agreement, the Plaintiff and that entity agreed to collaborate, "with a view to selecting the most promising candidates for full clinical development[.]" Id. at ¶ 50. "Products selected for full development will be the subject of a license from [the Plaintiff]." Id.

All of this is potentially relevant, see Outside the Box Innovations, LLC, 695 F.3d at 1292-95, but only if the patents that were the subject of the 2015 and 2016 Applications were

---

persuasive than one of its parts (586 employees) might have been, standing alone. But the Court evaluates the allegations and arguments the Defendants have made, not an edited-down version of them.

[19] The 2015 and 2016 Applications cover the '498, '726, '840, and '671 patents. See Affirmative Defense ¶¶ 54, 67-68, 71. (The Defendants might also be suggesting that their licensing-agreement theory, discussed in this section, applies to the 2017 Applications. See Amended Motion to Dismiss at 13. Nothing turns on whether it does.)

12

among the "[p]roducts" that had been "selected for full development" under the 2007 Agreement.

Were they? The Defendants do not say. The Counterclaim does not allege the 2015 and 2016 patents were "selected for full development." And the Counterclaim does not allege any facts from which that can be plausibly inferred.[20]

In short: the 2007 Agreement might well move the needle if it were relevant here. But the Defendants offer no reason to think it is.

### V. The Second Element of the Argument: Intent

As set out above, see Part IV, the Defendants did not adequately plead materiality. And they did not sufficiently plead intent, either.

To see why, begin by noting that to establish intent for inequitable conduct purposes, a claimant must "name the specific individual associated with the filing or prosecution of the application issuing . . . who both knew of the material information and deliberately withheld or misrepresented it." Exergen, 575 F.3d at 1329.

The Counterclaim did not do this.

Take first the 2015 and 2016 Applications, in which the Plaintiff said it was a small entity.

As to those Applications, the "material information," Exergen, 575 F.3d at 1329, was said to be the 2007 Agreement. See Part IV.B.

But while the Counterclaim names the "specific . . . individual[s]" who allegedly filed the 2015 and 2016 Applications, see Affirmative Defenses ¶¶ 54-55, 67-68, 71, it does not allege they knew about the 2007 Agreement.

---

[20] The Defendants' only substantial argument on this point is that the 2007 Agreement related to the field of "CNS and oncology" --- and the Drug treats epilepsy, which "is a disorder of the CNS." Brief in Opposition at 14. But this only suggests the 2007 Agreement could have covered the patents at issue, not that it did.

13

That, though, is what the law requires. See Exergen, 575 F.3d at 1329.[21]

To remedy this, the Defendants say the 2007 Agreement was "widely publicized," Brief in Opposition at 13, and argue that such information "would [have] be[en] available," id. at 19, to the lawyers who prepared the 2015 and 2016 Applications for the Plaintiff.

But this argument does not change the picture.

First, the governing standard here is "knew," Exergen, 575 F.3d at 1329, not could-have-known. Indeed, the Defendants' argument has been all-but been rejected by the Federal Circuit. See Therasense, 649 F.3d at 1290 (holding that the inequitable conduct intent requirement is not satisfied by a "should have known" argument); Exergen, 575 F.3d at 1330 (declining to infer that the attorney representing a patent applicant "was aware of an allegedly contradictory statement on [the applicant's] website," without additional facts to show the attorney was aware of the website statement); cf. C.R. Bard, Inc. v. Med. Components, Inc., 2019 WL 1746309, at *3 (D. Utah Apr. 18, 2019).

Moreover, even if one of the "specific . . . individuals" in question knew about the 2007 Agreement from public sources, that does not mean that "individual[]" would have known about the particular passage in the Agreement that is said to be relevant here. See Exergen, 575 F.3d at 1330 (the Court cannot "assume that an individual, who generally knew that a reference existed, also knew of the specific material information contained in that

---

[21] For some other relevant cases, see: Seaboard Int'l, Inc. v. Cameron Int'l Corp., 2013 WL 3936889, at *10 (E.D. Cal. July 30, 2013) (intent not properly pled because the complaint failed to allege "the specific individual who knew that [the patent applicant] did not qualify as a small entity and made the misrepresentation to the PTO") (cleaned up); Int'l Test Sols., Inc. v. Mipox Int'l Corp., 2017 WL 2118314, at *6 (N.D. Cal. May 16, 2017) (general knowledge of the company and its operations "not sufficient to support an inference" that an employee knew of particular information) (cleaned up). Other cases: Avocent Huntsville, LLC v. ZPE Sys., Inc., 2018 WL 4859527, at *9 (N.D. Cal. July 23, 2018); Pamlab, L.L.C. v. Viva Pharma, Inc., 2012 WL 3262825, at *3 (W.D. Wash. Aug. 8, 2012); Graphic Packaging Int'l Inc. v. C.W. Zumbiel Co., 2011 WL 4862498, at *3-4 (M.D. Fla. Sept. 12, 2011).

reference"); cf. Abaxis, Inc. v. Cepheid, 2011 WL 1044396, at *6 (N.D. Cal. Mar. 22, 2011) ("[T]he fact that [the defendant] disclosed the Buxton Patent while prosecuting the '016 patent does not lead to a reasonable inference that [the defendant] knew of the specific material information contained in the Buxton Patent.").

Finally, and as discussed above, see Part IV.B., the 2007 Agreement does not itself suggest that it concerns the patents that were the subjects of the 2015 and 2016 Applications. So even if the "specific . . . individuals," Exergen, 575 F.3d at 1328, knew about the relevant passages in the 2007 Agreement from public sources, there would have been no reason for them to conclude the Agreement had a connection to the patents at issue in the 2015 and 2016 Applications.

Bottom line: as to the 2015 and 2016 Applications, the Defendants did not properly plead intent.

Turn now to the 2017 Applications.

As to those, the "material information," Exergen, 575 F.3d at 1329, is said to be the Plaintiff's employee-headcount numbers, which allegedly nosed above 500 by early March 2017. See Part IV.A.

But while the Defendants identified the "specific . . . individual[s]," Exergen, 575 F.3d at 1328, who filed the 2017 Applications, they did not plead that those individuals knew how many employees the Plaintiff had. See Affirmative Defenses ¶¶ 60-64, 72-73. They needed to. See Exergen, 575 F.3d at 1329; see also footnote 21.[22]

---

[22] The Defendants work to fix this by making two final arguments. First, they suggest certain employee headcount numbers were "readily available," Brief in Opposition 20, from "public sources." Id. But this public information argument fails for the same reasons, set out above, as the Defendants' other public information argument. And moreover, given that small entity status is calculated based on average monthly employee numbers, see Part IV.A, top-line headcount numbers on their own are not as clarifying as the Defendants suggest. Second, the Defendants allege that five of the 2017 Applications started out as small entity applications --- but in July of 2017 the Plaintiff filed an adjustment of status, so that it would no longer be treated as a small entity for those 2017 Applications. See Affirmative Defenses ¶ 65. The Defendants would have the

15

In sum: the Counterclaim fails because it did not plead, as it had to, the "name [of] the specific individual associated with the filing or prosecution of the application issuing . . . who both knew of the material information and deliberately withheld or misrepresented it." Exergen, 575 F.3d at 1329.[23]

## VI. Conclusion

For the reasons set out above, the Defendants' counterclaims in Counts III, VI, IX, XII, XV, XVIII, XXI, XXIV, XXVII, XXX,

---

Court infer "specific intent to deceive the PTO," Exergen, 575 F.3d at 1329, from this. See Brief in Opposition at 20. But why? On the Defendants' allegations, the Plaintiff was averaging about 492 employees per month between March 2016 and March 2017, and growing at around 8 employees per month. At that rate, by July 2017, the Plaintiff would have averaged more than 500 employees per month for the preceding 12 months. Given all this, the plain inference is that the Plaintiff applied in July 2017 to change its small entity status because its status had, in fact, changed. The Plaintiff had grown. It was no longer a small entity, and so it told the PTO that. The Defendants' competing inference, of intent to deceive, is too far a stretch. See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 554, 556 (2007) ("conduct fails to bespeak unlawful" action when it is "just as much in line with a wide swath of rational" explanations); see also, e.g., Iqbal, 556 U.S. at 682; McCauley v. City of Chicago, 671 F.3d 611, 616 (7th Cir. 2011); Shepperson v. Hernandez, 2021 WL 2104978, at *2 (D.N.J. May 25, 2021).

[23] A final point. The Defendants allege the Plaintiff "filed several other applications in 2016 and early 2017 as large entities," Affirmative Defenses ¶¶ 55, 59, for patents that are not themselves in play in this case. These allegations are far afield. And in any event, they bear no real weight here. These allegations shed little light on materiality. Because a bona fide small entity may well need to file a patent application as a non-small-entity, because there is a license on the patent. And these allegations say next to nothing about intent. Because there is no suggestion in the Counterclaim that the "specific individual[s]," Exergen, 575 F.3d at 1328, involved in the patent applications at issue in this case knew anything about the "several other applications in 2016 and early 2017[.]"

16

XXXIII, XXXVI, XXXIX, XLII, XLV, XLVIII, LIII, LVI, and LIX are dismissed.

IT IS on this 11th day of January, 2024, so **ORDERED**.

_____
Michael E. Farbiarz, U.S.D.J.